UNITED STATES OF AMERICA
DISTRICT COURT OF MASSACHUSETTS

UNITED STATES OF AMERICA

V.                                                    NO. 04-10135

THOMAS P. SCOLA

SENTENCING MEMORANDUM
OF THOMAS P. SCOLA

Now comes the defendant, Thomas Scola and offers the following sentencing

memorandum to the Court. The defendant reasserts his objections to the procedural

manner in which his sentencing occurs as stated in his request for a jury trial and that all

enhancements be proven beyond a reasonable doubt.

The instant case revolves around two issues; the weight of the drugs in question

and the defendant's prior convictions. The defendant will address these issues in this

memorandum and his reasons for departures from the Sentencing Guidelines. The

defendant also seeks a variance from the Sentencing Guidelines based on his personal

history, the issues in this case and the manner in which all of these factors should be

considered in his sentence pursuant to 18 U.S.C. § 3553.[1]

## I. DEPARTURES FROM THE SENTENCING GUIDELINES

### A. Weight of Drugs

As previously indicated at the defendant's plea and in his objections to the Pre

Sentence Report, the defendant does not agree with the amount of drugs as proffered by

---

[1] The First Circuit appears to use the term "variance" when referring to consideration of factors that are not
explicitly "departures" under the Sentencing Guidelines. See, United States v. Thurston, 456 F. 3d 211
(2006).

the US Attorney and adopted by probation. At his change of plea, Mr. Scola plead guilty

to all aspects of the indictment, except for the weight of the drugs. Mr. Scola challenges

the weight based on sentencing manipulation by the agents pursuant to Note 14, USSG §

2D1.4 .

United States Sentencing Guidelines § 2D1.1, Note 14, establishes the concept of

sentencing manipulation as follows:

> If, in a reverse sting (an operation in which a government agent sells or
> negotiates to sell a controlled substance to a defendant), the court finds that the
> government agent set a price for the controlled substance that was substantially
> below the market value of the controlled substance, thereby leading to the
> defendant's purchase of a significantly greater quantity of the controlled
> substance than his available resources would have allowed him to purchase
> except for the artificially low price set by the government agent, a downward
> departure may be warranted.

While the circumstances in this case are not a "reverse sting", the weight charged

to the defendant is a product of sentencing manipulation. See, United States v. Montoya,

62 F 3d 1, 5 (1st Cir. 1995) (departures may be warranted in analogous situations).

"Where drug sentences are driven primarily by the type and quantity of drugs, the

potential exists for the government, not the court, to effectively dictate the defendant's

ultimate sentence. Law enforcement agents are in a position to decide when (i.e., after

how many drug transactions) to arrest the defendant. The agents, therefore, can fix the

amount of drugs, and even the kind of drugs, that will be attributed to [him]. United

States v. Lora, 129 F. Supp 2d. 77, 89 (D. Mass. 2001). At the probable cause and

detention hearing on April 12, 2004, Agent Steven C. Story, D.E.A. testified as follows:

P.23, Line 15

Q       And can you tell me, Agent Story, why there were 13 purchases?

2

A    It was part of the investigative strategy to conduct a long term undercover investigation with the attempt, with the objective of the undercover agent being introduced directly to defendant Nivar after gaining what we would believe to have been his trust after a series of protracted negotiations in multiple purchases.

Q    So it was, and actually, there was a point, was there not, w[h]ere an attempt was made to persuade Mr. Scola that the undercover agent would deal directly with Mr. Nivar?

Page 24

A    Yes, ma'am, that's correct.

Q    And that was not successful, is that correct?

A    That's correct.

Q    And what, where was that in the purchases, 1-13?

A    The subject had been discussed generally through the negotiations. It was specifically mentioned and I'll have to refer to the affidavit it identify exactly where basically this attempted introduction was rejected.

Q    Is this paragraph 15, if you would look at that?[2]

A    Yes Ma'am, that's correct. That would be one of the occasions which we attempted to make this direct introduction.

Q    So that was January 7th. That would have been after, let me see, the fourth purchase; is that correct?

A    No ma'am, January 27th.

Q    Correct, the Fourth purchase was, I'm sorry, so there was a purchase later that day? Yes, a purchase later that day on the 27th, is that correct?

A    That's correct.

---

[2] Paragraph 15 of Agent Story's states: " On January 27, the UCA had another recorded telephone conversation with Scola. Scola stated that his supplier was "scared to death" that the UCA wanted to purchase larger quantities so quickly. Scola related to the UCA that "the other guy" (understood by the UCA to refer to the supplier) wanted Scola to know more about the UCA and believed the UCA to be a 'cop". The UCA assured Scola that there was no need for his supplier to have concern and the two discussed the next heroin sale…"

Q    All right. And yet there continued to be nine more purchases; is that correct?

A    That's correct.

Q    And were there any more attempts to try to meet with Mr. Nivar directly between the agent and Mr. Nivar?

MR. TOBIN: Objection
THE COURT: Overruled. He may answer.

Page 25

A    After the January 27th date, that remained my investigative strategy and objective to continue to try to meet with the source of supply and negotiate directly with him and increase the quantities of heroin to be purchased.

BY MS. BASSIL:

Q    So were your trying to get over 100 grams of heroin?

MR. TOBIN:  I'll object to that, your Honor.
THE COURT: Sustained.

BY MS. BASSIL:

Q    Agent Story, did you know 100 grams of heroin was a mandatory minimum?

A    Yes

Q    Over 100 grams?

A    Yes

Q    And what steps did you take between January 27th and the arrest to try to arrange for direct meetings with Mr. Nivar?

… [Objections and response omitted]

The doctrine of sentencing factor manipulation has been at times, confused,

combined and conflated with the doctrine of entrapment. "The First Circuit, however,

clearly distinguishes between sentencing entrapment/manipulation departures, on the one

4

hand, and Note [14] departures, on the other. United States v. Lora, 129 F.Supp.2d 77, 89 (1st Cir. 2001). The defendant's predisposition to sale the drugs requested by the agent may be a factor but this is not an entrapment defense to the crime itself. Rather, the focus is primarily on the government's conduct and motives. United States v. Gibbens, 25 F. 3d 28 (1st Cir. 1994). As explained in a commentary, an example of "sentencing manipulation" would be when an undercover agent continues to engage in undercover drug purchases with a defendant, thereby stretching out an investigation which could have concluded earlier, for the sole purpose of increasing the defendant's sentencing exposure. Amy Levin Weil, "In Partial Defense of Sentencing Entrapment," 7 Fed. Sentencing Reporter 172, 174 (1995).

   The defendant seeks to exclude the amount of drugs purchased by the agent after January 27, 2004, which would place the amount at 27.2 grams. See, United States v. Connell, 960 F. 2d 191, 196 (1st Cir. 1992) ("We are confident that, should a sufficiently egregious case appear, the sentencing court has ample power to deal with the situation either by excluding the tainted transaction from the computation of relevant conduct or by departing from the GSR." ); United States v. Montoya, 62 F 3rd 1, 4-5 (1st Cir. 1995) ("Quite possibly - - we need not definitely decide the point - - a district court may order a discretionary downward departure from the guideline range on something less than extraordinary misconduct. "); United States v. Lenfesty, 923 F 2d 1293, 1300 (8th Cir. 1991) (government conduct designed to unfairly manipulate a defendant's sentence length may be grounds for downward departure); It is clear that the agents' strategy in seeking to meet the source of supply had failed by the fourth undercover buy and he continued to purchase drugs from the defendant until the weight of the drugs exceeded

100 grams by 6 grams. This was a "string of crimes prolonged by the government." See, contra, United States v. Montoya, supra at 4 (defendant did not meet his burden of proof in showing sentencing manipulation where the case involved a single transaction, not a string of crimes prolonged by the government"); United States v. Calva, 979 F 2d 119 (8th Cir. 1992) (government's continued purchases of narcotics from the defendant was reasonable as they were able to probe the extent of the distribution ring, identify forfeitable assets and to snare the defendant's supplier).

While the defendant's predisposition may be considered in evaluating the government's conduct, all undercover operations, by their very nature are designed to "tempt the criminally inclined, and a well constructed sting is often sculpted to test the limits of the target's criminal inclinations." United States v. Egemoyne, 62 F.3d 425, 427 (1st Cir. 1995). The agents were well aware of the defendant's drug addiction and acknowledged at the detention hearing that he was drug sick and at times incoherent. His addiction to heroin dominated the transactions in this case and colors his predisposition to commit the crimes in question. He never had the heroin "fronted" to him or on hand for the undercover agent to purchase. Rather, all transactions required the defendant to contact Nivar with the exact amount requested, meet Nivar, receive the drugs, meet the agent, exchange the drugs for money and return to Nivar for the money, where he was given heroin for his own use. The defendant's own supplier could not trust him with even a small amount of heroin, given the degree of the defendant's addiction . As long as the agent was seeking heroin from the defendant, the defendant was able to meet his own addiction. See, United States v. Staufer, 38 F 3d 1103 (9th Cir. 1994) ("[T]he Sentencing Commission now expressly recognizes that law enforcement agents should not be

allowed to structure sting operations in such a way as to maximize the sentences imposed

on defendants, and that courts may take into consideration the predisposition and capacity

of the defendant to engage in a deal of the magnitude for which he or she was

convicted.").

     In <u>United States v. Fontes</u>, 415 F 3d 174 (1st Cir. 2005), the Court sentenced the

defendant to a term below the guidelines calculation based on the government's

sentencing manipulation conduct in urging the defendant to sell crack cocaine rather than

powder. The First Circuit upheld the sentence stating:

> Because of the diversity of circumstances, we have declined to create
> detailed rules as to what is or is not undue manipulation. Instead, such
> claims must be approached on a case-by-case basis, albeit with due regard
> for the potential dangers of sentencing factor manipulation. Indeed, we
> have previously upheld the denial of a sentencing factor manipulation
> claim, even assuming that the agents;' motives were mixed and not of
> crystalline purity, where the defendant was otherwise legitimately targeted
> and the sting objectively reasonable in extent." Id. At 181

     In this case, the agents continued to purchase small amounts of drugs from the

defendant, on at least ten further occasions. They did not need to make the nine additional

transactions which exceed 80 grams in order to identify Nivar as the defendant's supplier.

They were well aware of Nivar's involvement from the second sale on January 18, 2004.

They knew by the fourth sale that Nivar would not deal directly with them. They knew

the defendant was a long standing heroin addict, living in off-season motels from week to

week, who did not own a car or any other identifiable assets worthy of forfeiture. As the

agent acknowledged, he was well aware of the consequences of sale of more than100

grams of heroin and the investigation ended when the amount of drugs reached slightly

over that amount. The weight of the drugs sold after January 27, 2004 should be excluded from the calculations.

With the defendant responsible for a weight less than 100 grams, the maximum sentence available under 21 U.S.C. § 841 is 20 years. There is also no mandatory minimum sentence.

If the career offender enhancement applies to the defendant with less than 100 grams of heroin, the offense level under USSG § 4B1.1 is 32 less 3 points for acceptance of responsibility, leaving the defendant with an offense level of 29 and a Criminal History Category of VI, resulting in a guideline sentence of 151-188 months. As will be reviewed later, the defendant believes that the career offender provision overstates his criminal history and requests that the Court either depart on those grounds or consider the guidelines in their advisory role as one factor to determine the appropriate sentence. See, United States v. Jiminez-Beltre, 440 f 3d 514 (1st Cir. 2006).

B. The Defendant's Prior Convictions

(1) 21 U.S.C. § 851

The government has filed an information pursuant to 21 U.S.C. § 851 charging the defendant with a prior felony drug conviction in 1989 in the Salem District Court. The defendant moved to vacate this conviction and the hearing scheduled for September 1, 2006 was postponed by the Salem Court to September 29, 2006. The defendant has asserted that he was not provided a full colloquy concerning his rights and his counsel of record has no memory of the case, no memory of the defendant and no file. The file in the Salem District Court does contain a jury waiver signed by the defendant, but there is no indication of any other rights given or waived by the defendant.

The defendant has requested that sentencing be postponed until this issue is resolved. At a minimum the defendant asserts that if he were to vacate this prior conviction, he would seek to return to this Court under 28 U.S.C. § 2255 and request resentencing.

The defendant also asserts that all prior convictions, including the conviction used by the Government pursuant to 18 U.S.C. § 851 which enhances both the minimum and maximum sentence must be proven to a jury beyond a reasonable doubt.

(2) Career Offender Issues

The defendant believes that the Court should depart from the guidelines in this case and sentence the defendant outside of the advisory guideline range. The defendant's criminal history and status as a career offender significantly over-represents the seriousness of his criminal history. The defendant's personal history as a drug addict and his involvement with drugs and his ability to participate in the drug program in the Bureau of Prisons diminish the likelihood that the defendant will commit further crimes.

With the weight of the drugs alleged at over 100 grams, an enhancement under 21 U.S.C. § 851 and the career offender provisions, the defendant's offense level (after acceptance of responsibility) at 34 and criminal history category at VI, placing his guideline sentence at 262 months to 327 months, or 21 to 27 years.

The career offender provision of the guidelines is not mandatory, but advisory under United States v. Booker, 543 U.S. 220 (2005). "After Booker, the Guidelines are merely advisory which means that district court has considerable leeway to impose a sentence that falls outside of the range suggested by the Guidelines." United States v. Robinson, 433 F 3d 31, 35 (1st Cir. 2006). "Although the career offender guidelines do

9

not set out particular grounds upon which a court may depart downward from recommended sentencing ranges, the Ninth Circuit and other circuits have held that the sentencing judge may rely on any policy statement or commentary in the guidelines that might warrant consideration in imposing sentence," United States v. Reyes, 8 F 3d 1379, 1383 (9th Cir. 1993).

The defendant's criminal history category significantly over-represents the seriousness of his criminal history.

Section 4A1.3 is a policy statement relating to the Adequacy of Criminal History Category which states : "There may be cases where the court concludes that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes. The Court may consider a downward departure from the guidelines based on this fact.

In United States v. Lindia, 82 F 3rd 1154 (1st Cir. 1996), the First Circuit held that the sentencing court may depart downward from a career offender calculation pursuant to USSG § 4A1.3. Because the career offender guideline increases both the defendant's offense level and criminal history category, a departure under USSG § 4A1.3 can reduce either or both of those scores. United States v. Shoupe, 35 F. 3d 835 (3rd Cir. 1994). ("The criminal history category departure under § 4A1.3 is specifically provided for in the Guidelines and is, in our view, conceptually distinct from the provision in § 5K2.0 for departures based on factors not accounted for in the Guidelines. We therefore conclude that 18 U.S.C. § 3553(b) and § 5K2.0 have no bearing on § 4A1.3").

The defendant's criminal history, while lengthy is also primarily drug offenses and minor charges. It is a criminal history that is typical for a drug addict. The only

10

violent offense on the defendant's record is a larceny from the person and assault and battery in 1990, over 15 years ago. The defendant states that the incident was slightly different from that stated in the police report, relied upon in the PSR. He reports that he was with his then girlfriend and as he was in his car getting gasoline, his girlfriend entered the station to pay. While the cash drawer was open, she grabbed the money in it and ran to the car. The attendant ran after her, demanded the money back and when she gave it to him, he punched her and continued to hit her. The defendant pushed him away from his girlfriend. The charged were reduced to larceny from the person and assault and battery. The remainder of the defendant's record is devoid of any violent offenses, indicating a reduced need to protect the public.

The career offender provision was designed to punish those repeat offenders that were dangerous and violent criminals. Senator Kennedy stated in Congressional hearings on the matter that: "The average drug dealer has committed at least five assaults and robberies against strangers in order to ply his trade .... Career criminals must be put on notice that their chronic violence will be punished by maximum prison sentences for their offense without parole." 128 Cong.Rec. 26,517 (1982). This is not a description of the defendant's criminal history.

All of the defendant's record is one of guilty pleas and most of them are for misdemeanors and minor felonies. As a drug addict, he often plead guilty in order to get back on the street as quickly as possible to get his next fix. The larcenies, check forging and receiving stolen property charges were all criminal activities committed to obtain money to feed his drug habit.

The United States Sentencing Commission published an evaluation of the sentencing guidelines and addressed the efficacy of the career offender provision as follows:

> The question for policymakers is whether the career offender guideline, especially as it applies to repeat drug traffickers, clearly promotes an important purpose of sentencing. Unlike repeat violent offenders, whose incapacitation may protect the public from additional crimes by the offender, criminologists and law enforcement officials testifying before the Commission have noted that retail-level drug traffickers are readily replaced by new drug sellers so long as the demand for a drug remains high. Incapacitating a low-level drug seller prevents little, if any, drug selling; the crime is simply committed by someone else. Most importantly, preliminary analysis of the recidivism rates of drug trafficking offenders sentenced under the career offender guideline based on prior drug convictions shows that their rates are much lower than other offenders who are assigned to criminal history category VI. The overall rate of recidivism for category VI offenders two years after release from prison is 55 percent (USSC, 2004). The rate for offenders qualifying for the career criminal guideline based on one or more violent offenses is about 52 percent. But the rate for offenders qualifying only on the basis of prior drug offenses is only 27 percent. The recidivism rate for career offenders more closely resembles the rates for offenders in the lower criminal history categories in which they *would be* placed under the normal criminal history scoring rules in Chapter Four of the *Guidelines Manual.* The career offender guideline thus makes the criminal history category a *less* perfect measure of recidivism risk than it would be without the inclusion of offenders qualifying only because of prior drug offenses.

United States Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform, 131-34 (2004).

By contrast, if this were a matter in the state court, the defendant would face a mandatory minimum sentence, depending upon the amount of drugs determined by the Court; 14 to 28 grams requires a mandatory sentence of 3 years, 28 to 100 grams is a five year mandatory sentence and 100 to 200 grams is a ten year mandatory sentence. Under

the proposed Massachusetts state guidelines, trafficking in heroin is a level 6 offense,

which carries anywhere from 40 to 120 months. When the federal guidelines were

enacted, Congress intended that ten year minimums were supposed to target

"manufacturers or the heads of organizations" who were "responsible for creating and

delivering very large quantities of drugs". H.R. Rep. No. 99-845, at 11-12, 16-17 (1986).

See. United States. v. Williams, 78 F. Supp 2d 189 (SDNY 1999); United States v. Webb,

966 F. Supp. 16 (D. DC 1997).

  The Court may and should take into account that the majority, if not all, of the

prior offenses were committed while the defendant was under the influence of drugs or

suffering from the effects of withdrawal. See, United States v. Hammond, 240 F. Supp.

2d. 872, 878 (E.D. Wis. 2003); United States v. Hammond, 37 F. Supp. 2d 204, 205

(E.D.N.Y. 1999) ('There is no history of violent behavior by Mr. Hammond. His prior

arrests resulted from minor drug crimes involving facilitation of the sale of drugs and the

kind of petty criminality associated with a poor addict's attempt to acquire money for the

purchase of narcotics. ); United Stats v. Abbot, 30 F. 3rd 71, 72 (7th cir. 1994) (Remand

for sentencing as court had the discretion to depart from the guidelines where the

defendant was not a "villainous criminal" and his "illustrates impulsive, alcohol related

behavior."); United States v. Hernandez, unreported , 2005WL 1423276 ( a long history

of drug addiction are part of the realities of the defendants' personal history and

characteristics which must also be considered 18 U.S.C. section 3553(a)(1)).

  In the instant offense the defendant plead guilty to the sale of heroin to an

undercover agent. The total amount of weight proffered by the government in these sales

is 106 grams; 6 grams above the cut off point for a mandatory minimum. In addition to

the orchestration of the weight, the government has filed an information under 21 U.S.C.

§ 851 which doubles the mandatory minimum to 10 years and increases the potential

under the career offender guidelines to life in prison. His base offense level is the same if

he had sold four times the amount of drugs. His co-defendant, who was his supplier and

higher up in the drug network, was found with almost double the amount of drugs,

admitted to a much higher level of participation in heroin trafficking as well as brokering

deals for cocaine. He faces a far lower sentence than the defendant.

     C. Other factors under the Guidelines.

     The defendant submits that pursuant to  USSG § 5K2.0 there are numerous factors

individually and in combination, that bring this case out of the heartland of the guideline

cases as determined by the United States Sentencing Commission and therefore, a

downward departure is warranted. The Court may and should consider the combination

of factors listed above, even if no one single factor is sufficient to warrant a departure.

United States v. Koon, 518 U.S. 81 (2005).


    **II. APPRENDI ISSUES**

     21 USC 841 provides a terraced sentencing structure based on the amount of

drugs. In the present case the defendant did not plead guilty to the amount and argues that

under Apprendi v. New Jersey, 530 U.S. 466 (2000) in conjunction with Blakely v.

Washington, 542 U.S. 296 (2004), United States v. Booker , 543 U.S. 220 (2005) and

Shepard v. United States, 544 U.S. 13 (2005), any fact, including the quantity of drugs,

which increases the maximum sentence must be proven to a jury beyond a reasonable

doubt. The defendant further argues that the government in failing to prove the quantity

of drugs by proof beyond a reasonable doubt to a jury, cannot  be sentenced to the

minimum mandatory sentence that accompanies a finding of weight over 100 grams of heroin. Finally, it is the defendant's position, that even if the Court were to decide the quantity of drugs, based on a lesser standard of proof the Court should find that based on sentencing manipulation, the defendant is responsible for less than 100 grams of heroin.[3]

If the Court finds, as the Government urges, that the defendant is responsible for more than 100 grams of heroin, based on a preponderance of the evidence and that there is a prior conviction, the defendant's statutory minimum increases from 5 years to 10 and the maximum increases from 20 years to life. If the Court finds, as the Government urges, that the defendant be determined to be a career offender, the sentencing guidelines increase the defendant's potential sentence from 188 to 235 months (under 100 grams) to 262 to 327 (over 100 grams). 262 months exceeds the 20 year statutory maximum for less than 100 grams of heroin and the Court has violated Apprendi by sentencing the defendant to more than the statutory maximum without a jury finding and on a lesser burden of proof.

The First Circuit has decided that drug quantities are not elements of the crime to be proven beyond a reasonable doubt, but sentencing enhancements to be proven by the government by a preponderance of the evidence. United States v. Aitoro, 446 F. 3d 246 (2006). The First Circuit based this decision on a prior, pre-Booker Decision, United States v. Goodine, 326 F. 3d 26 (1st Cir. 2003) which relied on Harris v. United States, 536 US 545 (2002). It is not possible to reconcile Apprendi after Blakely, Shepard and Booker with Harris. [4]

---

[3] The Court may also consider sentencing manipulation as a departure or as a variance in the factors used to determine the defendant's sentence.

[4] It should be noted that Harris was a 5-4 decision with the majority including Justices Rhenquist and O'Connor. Justices Thomas, Stevens, Souter and Ginsburg dissented finding that Apprendi meant that any

This, however, does not resolve the issue in this case, as Court noted in <u>Aitoro</u> that the defendant's sentence was not imposed subject to a mandatory minimum and because the defendant received a sentence in excess of the applicable mandatory minimum but less than the statutory maximum, the Court declined to review the issue. In <u>United States v. Perez-Ruiz</u>, 353 F 3d 1 (1st Cir. 2003), the First Circuit held that where a jury did not determine the quantity of drugs under 21 USC 841, the maximum sentence is 20 years. ("Because the issue of drug type and quantity was not properly submitted to the jury, the statutory maximum remained at 20 years. *See* <u>21 U.S.C. § 841(b)(1)(C)</u>. In sentencing the appellant to a term of imprisonment beyond that outer limit--life--the district court committed an *Apprendi* error. ") See, also <u>United States v. Bailey</u>, 270 F 3d 83 (2001) (Where the quantity of drugs was not submitted to a jury, the court committed reversible error in sentencing the defendant to a sentence of 262 months. The default statutory maximum was no more than 50 kilograms of marijuana which provided for a maximum sentence of five years. )

Unlike the defendants in <u>Aitoro</u> or <u>Goodine,</u> the defendant does face an increased sentence on the front end of the term of years as well as the end amount, based solely on the amount of drugs in question. The defendant urges the Court to adopt the procedure and reasoning suggested by Judge Young in <u>United States v. Kandirakis</u>, 2006 WL2147610 (D. Mass. 2006) which makes eminent sense given the continued confusion post-Booker and the changes that have taken place on the Supereme Court since the First Circuit ruled in <u>Goodine</u>. See, <u>United States v. Kandirakis,</u> ___F.2d at 32 ("Finally, given Remedial Booker's slim majority and the new composition of the Supreme Court, the

---

fact other than prior conviction that increased the penalty beyond a statutory maximum must be submitted to a jury and proven beyond a reasonable doubt. In Booker v. United States, Justices Scali and Breyer appear to have adopted the broader view of Apprendi urged by the dissent in Harris.

state of the law in this area is uncertain and in flux. See, Footnote 68; "Indeed, Justice

Ginsburg, who provided the crucial fifth vote for Remedial Booker, recently penned a

dissent in <u>Washington v. Recuenco</u>, 126 S. Ct. 2546 (2006), 2554-57, arguing that it was

structural error(not harmless error) for the jury not to decide sentencing factors – the very

remedy Remedial Booker precluded. Moreover, Chief justice Roberts and Justice Alito

did not sign a concurring opinion by Justice Kennedy which expressed thinly veiled

disapproval of <u>Apprendi</u> and <u>Blakely</u> though following it as Supreme Court precedent.")

The defendant seeks to, at a minimum preserve his rights to a jury trial under the 6th

Amendment, on what he perceives an element, not a sentencing factor and to request that

such an element be decided by proof beyond a reasonable doubt, under the 5th

Amendment. See, <u>United States v. Booker</u>, 543 U.S. 220, 319, n6 Thomas Dissent ("The

5th Amendment requires proof beyond a reasonable doubt, not by a preponderance of the

evidence, of any fact that increases the sentence beyond what could have been lawfully

imposed on the basis of facts found by the jury or admitted by the defendant.").[5]

The defendant is aware that <u>Almendarez-Torres</u> remains the law of this Circuit

and that any enhancement required by a prior conviction need not be proven to a jury

beyond a reasonable doubt. The defendant seeks to preserve his objection to this view,

given the concurring opinion filed by Justice Thomas in <u>United States v. Shepard</u>, 544

U.S. 13, 27-28 (2005) in which he states:

> *Almendarez-Torres,* like *Taylor,* has been eroded by this Court's subsequent Sixth
> Amendment jurisprudence, and a majority of the Court now recognizes that
> *Almendarez-Torres* was wrongly decided. See <u>523 U.S., at 248-249, 118 S.Ct.
> 1219</u>*28 (SCALIA, J., joined by STEVENS, SOUTER, and GINSBURG, JJ.,

---

[5] Judge Gertner in <u>United States v. Malouf</u>, 377 F. Supp. 2d 315 (2005) determined that the defendant's
plea, reserving the issue of the weight of the drugs, required a jury waived trial with the amount proven
beyond a reasonable doubt.

dissenting); *Apprendi, supra,* at 520-521, 120 S.Ct. 2348 (THOMAS, J., concurring). The parties do not request it here, but in an appropriate case, this Court should consider *Almendarez-Torres* ' continuing viability. Innumerable criminal defendants have been unconstitutionally sentenced under the flawed rule of *Almendarez-Torres,* despite the fundamental "imperative that the Court maintain absolute fidelity to the protections of the individual afforded by the notice, trial by jury, and beyond-a-reasonable-doubt requirements." *Harris v. United States,* 536 U.S. 545, 581-582, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (THOMAS, J., dissenting).

See, also, United States v. Rangel-Reyes, 126 S.Ct. 2873 (2006) where Justice Stevens, in denying a petition for certiorari stated that he continued to believe that Almendarez-Torres was wrongly decided.

### III. VARIANCES UNDER 18 U.S.C. § 3553

A. The defendant's personal history

Thomas Scola is thirty six years old and has spent at least half of his life as a drug user and addict. He grew up in Gloucester in a working class family, with a father who was a fisherman and a mother who was a nurse. The defendant never felt that he met the expectations of his father and was frequently the target of his criticism and demeaning remarks. School was difficult for Mr. Scola and he was diagnosed with Attention Deficit Disorder and treated with Ritalin, which only served to make him feel like an outsider. He first began to use marijuana at age 13 and for the first time felt comfortable in his own skin. He developed a peer group around drugs and found that awhile he was high, nothing much bothered him. He went from the use of marijuana to LSD, primarily around his devotion to the Grateful Dead.

The defendant, at about age 15, became a "Deadhead" ,a devoted follower of the Grateful Dead, following them across the country and using LSD as part of this lifestyle. His convictions in Alabama and North Carolina and Salem for LSD occurred as a result

of his traveling to concerts. The experience of being a "Deadhead" was described in A

Long Strange Trip, The Inside History of the Grateful Dead by Dennis McNally as

follows:

> The community was a collaboration between the fans and the Dead, who gave the
> Dead Heads their name, symbols and motifs to share such as the various logos,
> and a commitment demonstrated by constant performing, outstanding sound, and
> the lowest possible ticket prices. Because the band dressed and acted like the
> audience, because there was no "show", the audience correctly perceived them as
> people like themselves  who happened to be able to play – equal partners in a
> psychic quest. The Dead then displayed music and values that were just strange
> enough to invite a stigma that the Heads could share. It was not a coincidence that
> the subculture exploded in size during the Regan administration, when anything
> good or liberal was swept away in a sea of greed.
>
> Indeed, by the eighties and nineties the Dead Head subculture, a community,
> tribe, family and traveling circus was, as Garcia put it, the "last adventure". Like
> the Dead, the Dead Heads were quintessentially American, heirs to Daniel Boone
> and Huck Finn, who it out for the frontier when things got too "sivilized". The
> Dead Head's frontier is within as well as on the road, but they were no less
> pioneers for that. The Dead Heads had only one thing absolutely in common.
> Each one had experienced some inner click of affinity, some overwhelming sense
> of "here I belong" when confronted by the Dead, it music and scene. It was the
> recognition of an essentially spiritual experience that bound them together. They
> found a faith in the pursuit of transcendence, as initiated by psychedelics and
> music, and shared antiauthoritarian values that placed a premium on tolerance.
> Aft that, each person's role within the culture was improvised, in the same way as
> the music was played. The parking lot denizens who attended every show and
> dressed solely in tie-dye were extreme and attracted the media attention, though
> they were a tiny fraction of the whole. But all Dead Heads shared the faith of the
> pilgrim.

Id. at p. 385

Thomas Scola, always feeling like an outsider, never comfortable with who he

was or in his own skin, found acceptance and community as a Deadhead, attending over

100 concert sites all over the country whether or not he had a ticket. While this does not

excuse his criminal record, the reality is that the greatest victim of the defendant's drug

offenses is himself.

In addition to the LSD, the defendant began to experiment with cocaine, but it was heroin that took the greatest hold on him. He first tried heroin at age 21 and it was for him, an instant addiction, with no need or desire for other drugs. He tried at times to come clean and he moved twice with a former girlfriend to get away from his known drug locations and dealers. They moved to Florida and to North Carolina, but the pull of heroin was always too strong for him. While in North Carolina, his girlfriend, Heather Fife became pregnant and his parents took custody of his son Anthony. Anthony is nine years old and is being raised by Mr. Scola's parents. Anthony has been told that Mr. Scola is out of state working. It is not certain where Anthony's mother is at the present time. At one point, the defendant believed she was living in a Christian rehabilitation center for a number of years. She has not had any involvement in Anthony's life.

B. The purposes of sentencing under 18 U.S.C. §3553

With the sentencing guidelines as advisory, the Court must now also look to 18 U.S.C. § 3553(a) (2) to inform its sentencing decision. The sentence imposed must (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; and (C) protect the public from further crimes of the defendant and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

When applying these factors to Thomas Scola's case, it becomes clear that a sentence of no more than 10 years imprisonment, which includes participation in the drug program and supervised release is sufficient to achieve all of these goals. Without the manipulation of the agents in this case, the defendant would be unlikely to be facing a

mandatory minimum. Without the application of the 21 U.S.C. § 851, the defendant would not be facing a doubling of a five year mandatory minimum to ten years. Without the career offender enhancement, the defendants' guide line range would have been anywhere from a Level 21 (under 100 grams of Heroin with a Criminal History Category of V and a sentence of 70-87 months. (Over 100 grams would have been a sentence of 84 to 105 months). A sentence of no more than 10 years would reflect the seriousness of the offense, promote respect and provide just punishment. It would certainly protect the public from further crimes of the defendant and without question would provide the defendant with adequate treatment. Whether a sentence of 21 to 27 years would be a greater deterrence to this crime is open to debate. A study by Physicians for Human Rights on the New York Rockefeller Drug Laws found that no parallel reduction in drug offending matched the imposition of severe mandatory drug sentences. [6]

When Congress enacted the sentencing guidelines it failed to express a coherent philosophy of punishment. The members of the Sentencing Commission could not agree on which purposes of sentencing were the most import, deciding in the end to decline to articulate a philosophy of sentencing that could explain the guidelines priorities. Hofer and Allenbaugh, "The Reasons Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines", 40 American Criminal Law Review 19, 21 (2003).

When the Anti-Drug Abuse Act of 1986 was enacted, it established statutory minimum sentences key to drug quantity. Congress intended that drug quantities would serve as a proxy for a defendant's role in the offense. In particular, five-year minimums

---

[6] "Nothing is more destructive of respect for the government and the law of the land than passing laws which cannot be enforced. It is an open secret that the dangerous increase of crime in this county is closely related with this. " Albert Einstein.

were supposed to target "managers of the retail traffic" who were "filling the bags of heroin, packaging crack cocaine into vials… and doing so in substantial street quantities"; and ten year minimums were supposed to target "manufacturers or the heads of organizations" who were "responsible for creating and delivering very large quantities of drugs." H.R. Rep. No. 99-845 at 11-12, 16-17 (1986). Thus, the mandatory minimum sentences were correlated to drug quantities in order to punish "mid-level traffickers" and then "kingpins" and "masterminds". See 132 Cong. Rec. S. 14,300.

The defendant's pitiful drug dealing; in which he was never trusted with more than the exact amount he would sell to the agent and the immediate return to Nivar with the money in order to receive drugs hardly qualifies him as a mid-level trafficker or a mastermind or king pin. At best, he is a "junkie-dealer", that is a drug addict who must deal drugs in order to meet his own needs and one who is easily manipulated by the supplier and easily replaceable.

18 U.S.C. § 3553 also mandates the "parsimony principle": The Court is obliged to assign a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing. Those purposes include just punishment, deterrence, public protection, and to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." United States v. Lacy, 99 F. Supp. 2d 108, 119 (D. Mass. 2000).

18 U.S.C. § 3553(a)(2)(D) also requires that the sentence provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. It is clear that the drug treatment program available to the defendant will provide him with much needed care.

22

Both the parsimony principle and the provision which requires the court to consider needed treatment for a defendant conflict with the rigid step approach to drug sentences in the guidelines, which base sentences exclusively on the amount of the drug. If the Court is to consider the guidelines in an advisory capacity and sentence according to the provisions of 18 U.S.C. § 3553, the Court must conclude that incarceration for a limited, although not short period of time and treatment is a far better outcome for both the defendant and society as a whole.

The defendant is clean of drugs for the first time in many years.[7] He has also expressed his eagerness to participate in the drug program available through the Bureau of Prisons. He has shown for the first time in his life a strong desire to stay drug free and acknowledges that he has not been able to do this himself. While drug addiction was not grounds for a departure under the Sentencing Guidelines, extraordinary rehabilitation could be considered and should be by this Court.

The National Institute for Drug Abuse has concluded that prison based drug treatment programs can be highly effective, if they are combined with community release:

> Offenders with drug disorders may encounter a number of treatment options while incarcerated, including didactic drug education classes, - help programs, and treatment based on therapeutic community or residential milieu therapy models. The TC model has been studied extensively and can be quite effective in reducing drug use and recidivism to criminal behavior. Those in treatment should be segregated from the general prison population, so that the "prison culture" does not overwhelm progress toward recovery. As might be expected, treatment gains can be lost if inmates are returned to the general prison population after treatment. Research shows that relapse

---

[7] The defendant kicked his drug habit upon his incarceration without the benefit of any treatment. The facilities for federal detainees at the Plymouth House of Correction do not provide for drug treatment programs.

23

to drug use and recidivism to crime are significantly lower if the drug
offender continues treatment after returning to the community.

Principles of Drug Addiction Treatment: A Research Based Guide, National Institute for

Drug Abuse. Allowing, indeed encouraging, the defendant to participate in drug

treatment, only to warehouse him for an inordinate number of years thereafter makes no

sense. "Rehabilitation is also a goal of punishment. 18 U.S.C. § 3553 (a)(2)(D). That

goal cannot be served if a defendant can look forward to nothing beyond imprisonment.

Hope is the necessary condition of mankind, for we are all created in the image of God. A

judge should be hesitant before sentencing so severely that he destroys all hope and takes

away all possibility of useful life. Punishment should not be more severe than that

necessary to satisfy the goals of punishment". United States v. Carvajal, Unreported, and

2005 WL 476125 (S.D.N.Y. 2005) .When punishment is disproportionate to the offense,

it squanders resources, creates disrespect for the law, and fails to achieve just

punishment.

## CONCLUSION

For all of the above stated reasons, the defendant Thomas Scola, respectfully requests this Honorable Court sentence him to no more than ten years.

THOMAS P. SCOLA
By his attorneys:

CARNEY & BASSIL

/s/Janice Bassil

Janice Bassil
BBO #033100
20 Park Plaza, Suite 1405
Boston, MA 02116
(617) 338-5566

Date:  September 6, 2006